**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Frank P. PETZOLD, Jr., a/k/a Skip
Petzold, Defendant-Appellant.**

**No. 85–5593.**

United States Court of Appeals,
Eleventh Circuit.

May 9, 1986.

Bruce Rogow, Ft. Lauderdale, Fla., for defendant-appellant.

Leon Kellner, U.S. Atty., John M. Owens, Sp. Atty., U.S. Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a conviction on one count of obstruction of justice in violation of Title 18 U.S.C. § 1503[1] and one count of perjury in violation of Title 18 U.S.C. § 1623.[2]

## BACKGROUND

A federal grand jury in Fort Lauderdale, Florida was investigating a real estate development called Stonewal Estates, and its developer, Thomas Waldron. The investi-

---

1. Section 1503 states:

 *Influencing or injuring officer or juror generally*

 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

2. Section 1623(a) states:

 *False declarations before grand jury or court*

 (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

gation focused upon loan applications which had been submitted to Sunrise Savings and Loan, a federally insured savings and loan association, in connection with about a dozen sales of Stonewal lots to buyers who were close friends or business acquaintances of Thomas Waldron. The applications reflected a $75,000 purchase price for Stonewal lots, with $13,000 cash deposits, thus inducing Sunrise to lend $62,000 to the purchasers. The government contended that the actual purchase price was $62,000 and that the bank was being fraudulently induced by applications to lend the full purchase price, rather than the 85% maximum provided for by the loan contract.

The investigation of the Stonewal sales commenced in May, 1984. Some witnesses testified that they paid $62,000 for the lots, and then signed, or were asked to sign, promissory notes reflecting that Waldron had lent them $13,000.

On September 7 and October 26, 1984, appellant Frank P. "Skip" Petzold appeared before the grand jury. Petzold, a friend and business associate of Waldron, appeared as a witness in connection with the grand jury's examination of the sale of Lot 146, which had been sold to Alfred Reynolds, Petzold's neighbor.

During the spring of 1984, Alfred Reynolds purchased Lot 146 through Petzold, a licensed real estate broker. The purchase agreement reflected a purchase price of $75,000 with a $13,000 cash deposit. When the agreement was executed, no $13,000 deposit had been made. Sometime prior to closing, Petzold informed Reynolds that the purchase price would be $65,000 rather than $75,000. Reynolds then submitted a loan application to Sunrise for $62,000. On March 17, 1984, Reynolds gave Petzold a personal check in the amount of $3,000 as a deposit on Lot 146.

Prior to the closing on April 16, Sunrise Savings and Loan called Reynolds and requested more information about his loan application. Reynolds eventually obtained the $62,000 from another bank. This loan was secured by other property owned by Reynolds.

The closing statement showed a $75,000 selling price and a $13,000 deposit. It did not show the $3,000 which Reynolds paid Petzold on March 17. Reynolds presented a cashier's check for $62,686.84, bringing to $65,000 the amount Reynolds paid for the lot plus the closing costs.

On June 2, 1984, Petzold asked Reynolds to exchange $13,000 checks. Reynolds gave Petzold a $13,000 check payable to Skip Petzold Realty Escrow Account, noting "purchase of Stonewal." Petzold gave Reynolds a check for the same sum. This check was drawn on his personal account rather than his real estate escrow account. Petzold claims that Reynolds agreed to the exchange of checks because of his trust in Petzold and that there was no discussion of rebates, or promissory notes or discounts. The government describes this exchange as a series of sham transactions designed to give the impression that Reynolds had signed a $13,000 promissory note and then paid it off to cover the $13,000 deposit on his purchase of Lot 146.

After completing the exchange of checks, Petzold wrote a letter to Waldron dated June 3, 1984 on Skip Petzold Realty, Inc. letterhead. The letter stated:

Dear Tom,

I am in receipt of Mr. Reynolds $13,000 to cover your demand note.

Please execute the note, satisfied, on Lot # 146 and I will deliver to you the funds in my escrow acct. to cover this payment in full.

Thank you,

Skip Petzold.

The letter bears a "Received" stamp dated June 6, 1984.

Petzold wrote another letter to Waldron bearing the date June 8, which reads:

Dear Tom,

Just for your records, I left your Sec'y, my escrow check in the @ of $13,000 to close out Mr. Reynolds' purchase of lot # 146 Stonewal.

Mr. Reynolds thanks you for the additional time and he loves his lot. I think he will build.

Sincerely,
Skip

This letter bears a "Received" stamp dated June 8, 1984.

Petzold also executed a check drawn on the Petzold Realty, Inc., escrow account, check no. 131, dated June 8, 1984, in the amount of $13,000 payable to "Stonewal Dev. Inc." The face of the check had a note stating: "Note Pd, in full Bal due to close #146 Reynolds." The check was deposited to the account of Stonewal Development, Inc. at Sunrise Savings and Loan Association.

On June 22, approximately two weeks after the exchange of $13,000 checks with Reynolds, the issuance of the Petzold Realty escrow check to Stonewal and the writing of the two letters of explanation, Frank Petzold received two checks on behalf of Thomas Waldron, totaling $13,000. However, neither check was written on a Stonewal account and neither was deposited into the Petzold Realty escrow account. Rather, one check was made payable to Frank Petzold from the Diamond C. Enterprises, Inc., account in the amount of $8,750. That check was deposited to the account of Frank Petzold. The other check was drawn on the account of Village Liquidators, payable to Frank Petzold in the amount of $4,250 and deposited to the account of Frank Petzold. Thus, there was a clear swap of checks.

Appellant first testified before the grand jury on September 7, 1984. In describing the Reynolds purchase, he testified:

Al Reynolds was to buy the lot for $65,000 if he got his own financing. That would be a discounted price, because it was my understanding that the lots were being offered for $70–5 thousand.

\* \* \* \* \* \*

If he paid, you know—used his own financing, whether it was borrowing money or whatever, he would buy the lot for $65,000. That was his purchase price.

At one point, the prosecutor asked, "Sir, did it ever come to your attention that in connection with the sales to insiders a number of promissory notes were typed and prepared?" Appellant responded, "No, sir."

On October 26, appellant appeared a second time. His testimony at the second appearance is the basis of the perjury charge.

During his second appearance before the grand jury, appellant reaffirmed the truthfulness of the answers given during his September 7 appearance. The following is an excerpt of relevant testimony: [3]

Q. In any event, I take it then you haven't discussed with Mr. Reynolds executing a $13,000 promissory note or anything like that?

A. That is correct.

Q. And you're clear in your own mind that the $13,000 check on or about June 8th, that you gave back to Stonewal, was not in payment of any promissory note?

A. That's correct.

Q. Did Mr. Reynolds indicate to you that he had signed a promissory note in connection with the purchase of lot 146?

A. Never discussed the promissory note with Mr. Reynolds.

Q. But you certainly never indicated to Mr. Waldron at that time that check 131 was in payment of a note?

A. No. Really, I don't think there was any correspondence on it at all.

Q. Ok. But in any event, it was the check, it was, as you understood it, like a rebate, that was a series of checks to reflect a rebate. It was not in payment of any promissory note.

A. Right.

3. The alleged perjurious testimony is underlined.

The specifications of perjury are set out below, with the specific false declarations underlined.

Q. ... Now, you also say here, though, on the top there—in the lower left legend, "Note paid in full." Now, what did you mean when you wrote on there "Note paid in full"?

A. ... Now I also wrote under here, "balance to close number 146 Reynolds." That was a note for my bookkeeping purposes as to what these funds were being paid out for. This was the notation to me that this was to correct the accounting that I assume was incorrect—incorrectly done at the time of closing.

Q. I see, I take it then that the check number 131 was in payment of a note, a demand note?

A. No, it was not.

Q. Did you ever indicate that check number 131 was in payment of a note, a demand note?

A. No. I didn't.

 * * * * * *

Q. But you certainly never indicated to Mr. Waldron at that time that check 131 was in payment of a note.

A. No. Really, I don't think there was any correspondence on it at all.[4]

Q. Did you ever discuss with Mr. Waldron any promissory note for $13,-000 in relation to the Reynolds purchase.

A. No.

[4] This answer was eliminated as specification of perjury by the trial court by removing the underlining from the answer prior to the submission of the indictment to the jury, on the defendant's Rule 29, F.R.Cr.P., motion. The question and answer, however, were left in the text of the indictment.

The basis of the obstruction of justice charge is Petzold's alleged participation ... in the creation of false documents and an exchange of checks to create the false and misleading appearance that the purchaser of Lot 146 had received a loan for the amount of the down payment set forth in the purchase price ... and giv-ing false, evasive and misleading testimony before the grand jury about the Reynolds transaction.

The trial court denied appellant's motion for judgment of acquittal.

## ISSUES

(1) Whether the literal truth defense articulated in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), precludes appellant's perjury conviction.

(2) Whether there is sufficient evidence to support appellant's obstruction of justice conviction.

## DISCUSSION

### I. *Bronston v. United States*

■ Appellant cites *Bronston* for the proposition that "a witness may not be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." He further cites *Bronston* as stating unequivocally that: "Precise questioning is imperative as a predicate to perjury." According to appellant, his perjury conviction should be reversed because his answer to each question was literally true.

### A. *Question about the Demand Note*

One of the alleged perjurious statements was appellant's testimony that he had never "indicate[d] that check number 131 was in payment of a note, a demand note." Appellant argues that neither the June 3rd nor the June 8th letter to Tom Waldron makes specific reference to check number 131. He further argues that the check itself indicated "Note pd. in full," rather than "*demand* note paid in full."

In response, the government argues that although the check refers to a "note" rather than a "demand note," the "note" to which it refers is that which is identified in the previous letter of June 3, where the

reference is to a "demand note." [4] Finally, the government argues that "the term 'check 131' is not material to the substance of the question and its use as a shorthand reference does not give rise to the literal truth defense as a matter of law."

As to the first part of the argument, the statement above shows that in the June 3 letter signed by Petzold, addressed to Tom Waldron, Petzold stated: "Please execute the note, satisfied, on Lot # 146 and *I will deliver to you the funds in my escrow account to cover this payment in full.*" (Emphasis supplied.) Then, in the June 8 letter, Petzold wrote: "I left your secretary, my escrow check in the @ of $13,000 to close out Mr. Reynolds' purchase of the Lot # 146 Stonewal." The check enclosed was check no. 131 as to which Petzold, when testifying before the grand jury, stated that he never "indicate[d] that check no. 131 was in the payment of note, a demand note."

It is true that the number of the check was not mentioned in either letter to Waldron, but the note which was enclosed in the second letter from Petzold to Waldron clearly "indicated" that the enclosed check was in payment of the note. Thus, it is clear that his testimony that he did not indicate this fact, was false.

B. *Discussion with Waldron Question*

One specification of perjury is based on this question and answer:

Q. Did you ever discuss with Mr. Waldron any promissory note for $13,000 with relation to the Reynolds purchase?

A. No.

The heart of appellant's claim is that the question referred to a "promissory" note, not a "demand" note, and thus since Petzold and Waldron discussed a "demand" note, Petzold's answer, "no," to the question whether he discussed a "promissory" note was literally true. It could not, therefore, constitute perjury.

He also contends that there is no evidence of any "discussion" between him and Waldron with relation to the Reynolds purchase.

The argument that the face of the check carried the notation "note paid in full" rather than "demand note paid in full" and that this prevents the answer from being false, is specious in the extreme. Not only did Petzold use the terms "note" and "demand note" interchangeably (probably because there were, in fact, no such notes in existence), the words "note paid in full" clearly covered the "demand" note, which appellant itself called a "note" by his entry on the check he delivered to Waldron. The same answer must be given to appellant's criticism as to the use by the prosecutor in his question of the term "promissory note" instead of "demand note." The term "promissory note" is all inclusive, incorporating a demand note as well as any other type of promissory note. No one argues here that whatever note they were talking about would not be the ordinary promise of a borrower to pay a lender. That would constitute a promissory note even if it was also due on demand.

With respect to the appellant's argument that there is no evidence of a "discussion" between Petzold and Waldron with relation to Reynolds' purchase, the government points to the correspondence between Petzold and Waldron as being sufficient from which the jury could infer that this correspondence and the delivery of the check by Petzold to Waldron could not have been carried out without some discussion between the two persons.

In the first of these letters, Petzold stated to Waldron: "I am in receipt of Mr. Reynolds $13,000 to cover your *demand note*" and "Please execute the note, satisfied, on lot 146 and I will deliver to you the funds in my escrow account to cover this payment in full." Then, five days later,

---

**4.** The letter says: "I am in receipt of Mr. Reynolds $13,000 to cover your *demand note.*" (Emphasis added.)

Petzold wrote another letter to Waldron stating: "Just for your records, I left your secretary my escrow check in the amount of $13,000 to close out Mr. Reynolds purchase of lot # 146 Stonewal."

Although the government does not contend that these two letters, in and of themselves, amount to a "discussion," which we consider it might well have argued, the prosecution contends that there can be no doubt that the jury could infer from these two letters and the actual check, which bore on its face the notation "note paid in full" that during and/or before these acts by the parties there must have been some discussion between Petzold and Waldron concerning a promissory note for $13,000 with relation to the Reynolds purchase.

We agree. Since the standard by which we review the sufficiency of the evidence is that the evidence must be viewed, together with the inferences that may be drawn from it in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir., Unit B, 1982), the evidence was sufficient to allow a reasonable jury to find Petzold's statement was false.

We are satisfied that the evidence as to the course of conduct between the parties, including the correspondence between Petzold and Waldron, was sufficient to permit the jury to infer that Petzold had, in fact, discussed with Waldron something concerning a promissory note. The whole scheme set up, and discussed by the two persons in the correspondence involved the fictitious creation of promissory notes. A jury could reject the idea that Petzold would create documents to be placed in the file of Waldron's company that would falsely represent the situation without some discussion with Waldron, especially when Waldron responded in the manner that the jury could find was agreed upon when he had his companies disburse checks to Petzold that corresponded to the penny with the check given him out of Petzold's escrow account.

C. *Another specification of perjury arises from the following question and answer:*

Question, what did you mean by "Note Paid in full? In response to this question, appellant answered:

And I also wrote under here, "Balance to close number 146 Reynolds." *That was a note for my bookkeeping purposes as to what the funds were being paid out for. This was the notation to me that this was to correct the accounting that I assume was incorrect—incorrectly done at the closing.*

Appellant argues that the underlined statements were literally and syntactically not responding to the prosecutor's question, but were an elaboration on the "Balance to close number 146 Reynolds" notation. According to appellant, he never responded to the prosecutor's question.

The response was ambiguous in the sense that it is impossible to tell whether, when the witness used the word "note," he referred to the word "note" used in the prosecutor's question or to the notation he had written on the face of the check. Therefore, if his answer to the question had been true as to what was meant by the note he wrote on the face of the check, he might arguably defend his response as not being perjurious. However, and this is what decides the case against him, the statement he made as to the notation to the effect that: "This was to correct the accounting that I assume was incorrect—incorrectly done at the closing" is clearly false because it is undisputed that no such incorrect accounting had taken place at the closing, and his statement that this notation was to correct the records of the closing is clearly false.

Accordingly, we conclude that since *Bronston* prohibited only the finding of guilt in a perjury trial if the answer of the alleged perjurer is literally true, it is of no aid to appellant here, because none of these statements was literally true.

## II. Sufficiency of Evidence to Support Obstruction of Justice Conviction

■ The obstruction of justice count (Count One) was premised upon the allegation that Petzold participated

> ... in the creation of false documents and on exchange of checks to create the false and misleading impression that the purchaser of Lot 146 had received a loan for the amount of the down payment set forth in the purchase agreement submitted to Sunrise Savings and Loan Association of Florida, and by giving false, evasive and misleading testimony before the aforesaid Grand Jury on September 7, 1984, and on October 26, 1984, to conceal, cover up and withhold from the Grand Jury his knowledge that the above mentioned eschange [sic] of checks was a sham transaction designed by FRANK P. PETZOLD, JR. and others to trick federal criminal investigators into believing that the documents submitted to Sunrise Savings and Loan Association were accurate.

■ We agree that specific intent to impede a grand jury investigation is an essential element of a § 1503 violation, *United States v. McComb*, 744 F.2d 555 (7th Cir. 1984). It is also true, however, that intent may be inferred by a jury from all the surrounding facts and circumstances, *United States v. Haldeman*, 559 F.2d 31, 115–16 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

We are satisfied that the jury here could infer from the creation of the paper trail made up of fictitious transactions by Petzold, who was aware of the fact that the grand jury was investigating similar transactions of Waldron, that his acts were done for the very purpose of impeding the grand jury investigation. It is undisputed that the letters and check would create the false impression that Lot # 246 was sold to Reynolds for $75,000 when, in fact, it was sold for $62,000. It is also undisputed that this impression was created by the fictitious documents prepared by Petzold. The jury could then, of course, infer that this was done by appellant for the purpose of misleading the grand jury. Such a finding by the jury would amount to a finding that Petzold had "corruptly endeavored" to influence the due administration of justice, *United States v. Buffalano*, 727 F.2d 50, 53 (2d Cir.1984), the crime for which he was indicted.

The judgment is AFFIRMED.