**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-10848

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

EDUARDO ULISES MARTINEZ,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20137-JEM-1

————————————

Before JORDAN and BRASHER, Circuit Judges, and COVINGTON,* District Judge.

JORDAN, Circuit Judge:

A grand jury indicted Eduardo Ulises Martinez on eight counts of smuggling goods into the United States in violation of 18 U.S.C. §§ 545 and 2 and 50 C.F.R. §§ 14.52 and 14.61 (Counts 1–8), three counts of smuggling goods from the United States in violation of 18 U.S.C. §§ 554(a) and 2 and 50 C.F.R. §§ 14.52 and 14.63 (Counts 9–12), and two counts of obstruction of justice in violation of 18 U.S.C. § 1503(a) (Counts 13–14). The government subsequently dismissed Count 14, and Mr. Martinez proceeded to trial. The jury convicted him of all charges except Counts 5, 9, and 11, on which it acquitted him. The district court imposed a sentence of 51 months' imprisonment.

On appeal, Mr. Martinez challenges his convictions and his sentence on various grounds. After reviewing the parties' briefs and the record, and with the benefit of oral argument, we affirm.

**I**

Before setting out the evidence presented at trial, we summarize the relevant statutory and regulatory framework for the smuggling charges.

---

* Honorable Virginia M. Covington, United States District Judge for the Middle District of Florida, sitting by designation.

## A

The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249 (entered into force July 1, 1975), "established a regulatory system that monitors the trade in wildlife . . . passing through one member country to another." *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997) (citation and internal quotation marks omitted). CITES "resulted from the recognition by the signatory countries 'that international cooperation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade.'" *Id.* (quoting CITES, 27 U.S.T. at 1090). The United States is a signatory to CITES. *See* 27 U.S.T. at 1230, 1349.

CITES includes appendices that "classif[y] protected species according to the extent to which they are endangered[.]" *Grisby*, 111 F.3d at 814. Species listed in Appendix I, such as the African elephant (*Loxodonta africana*), are "species threatened with extinction which are or may be affected by trade." CITES, art. II, para. 1 & app. I. *See also Grigsby*, 111 F.3d at 814–15 ("The African elephant, *Loxodonta africana*, . . . was listed in CITES Appendix II on February 4, 1977, and upgraded to Appendix I in 1990."). The trade of species listed in Appendix I "must be subject to particularly strict regulation in order not to endanger further their survival and must

4                    Opinion of the Court                    23-10848

only be authorized in exceptional circumstances."  CITES, art. II, para. 1.[1]

Through the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.*, Congress implemented CITES into United States law.  *See United States v. Norris*, 452 F.3d 1275, 1277–78 (11th Cir. 2006).  "The [Endangered Species Act] makes it unlawful to 'engage in any trade in any specimens,' or 'possess any specimens traded,' contrary to the provisions of [CITES] and authorizes the Secretary of the Interior to promulgate regulations to enforce the [ESA]."  *Id.* at 1278 (quoting 16 U.S.C. §§ 1538(c)(1), 1540(f)).  *See also Safari Club Int'l*, 878 F.3d at 322 ("Except in narrow circumstances, the [ESA] generally prohibits the importation of endangered species into the United States.") (emphasis removed).  As a result, CITES regulates the importation into and exportation out of the United States of endangered species listed in its appendices.  *See, e.g., Norris*, 452 F.3d at 1278 ("To import Appendix I [species] into the United States, an importer must obtain (1) a valid export permit from the country of origin and (2) a valid import permit from the [Service]."); *United States v. Crutchfield*, 26 F.3d 1098, 1099 (11th Cir. 1994) ("Because of the Figis' endangered status, CITES regulates the importation of this special iguana into the United States.").

Except as provided in 50 C.F.R. § 23.92, "it is unlawful for any person subject to the jurisdiction of the United States to . . .

---

[1] Elephants from some countries have since been moved back to Appendix II of CITES, as explained in *Safari Club International v. Zinke*, 878 F.3d 316, 321–22 (D.C. Cir. 2017).

23-10848                 Opinion of the Court                    5

[i]mport, export, re-export, or engage in international trade with any specimen of a species listed in Appendix I, II, or III of CITES." 50 C.F.R. § 23.13(a).  As noted, the African elephant is a species listed in Appendices I and II of CITES.  *See* CITES, art. II, para. 1 & 2 & app. I & II; *Safari Club Int'l*, 878 F.3d at 321–22.  "Except for antiques and certain manufactured or handcrafted items containing de minimis quantities of ivory, sale or offer for sale of ivory in interstate or foreign commerce and delivery, receipt, carrying, transport, or shipment of ivory in interstate or foreign commerce in the course of a commercial activity is prohibited."  50 C.F.R. § 17.40(e)(3).

That ivory may ultimately be exempted under the antique or de minimis exceptions does not do away with the obligation under 50 C.F.R. §§ 14.61 and 14.63 to declare ivory that is being imported into or exported out of the United States.  *See, e.g.,* 50 C.F.R. § 23.92(b) ("For specimens that are exempt from CITES requirements, you must still follow the clearance requirements for wildlife in part 14 of this subchapter[.]").  We discuss these obligations later.

**B**

The U.S. Fish & Wildlife Service began investigating Mr. Martinez after being told by a confidential informant that he was traveling internationally and possibly bringing back ivory.  After confirming with the Department of Homeland Security that Mr. Martinez was traveling abroad, the Service searched its database and determined that he had not filed certain required declarations or obtained import or export licenses for ivory.  The Service, along

with DHS, requested an alert from Customs and Border Protection when Mr. Martinez returned to the United States.

On September 8, 2021, CBP stopped Mr. Martinez at Miami International Airport to inspect his luggage for ivory in response to the Service's alert. Mr. Martinez confirmed the luggage was his but denied buying or bringing any ivory into the United States. Yet CBP found three ivory pieces (and tools to work with small objects) among the clothes and personal effects in Mr. Martinez's luggage.

Mr. Martinez denied that the pieces were ivory and instead claimed that they were made of porcelain. When confronted again about the pieces, he said that "he was 90% sure it was ivory," but knew he was not in trouble because "it was 100 years old or more than 100 years old[.]"

The Service, along with DHS, continued the interview as part of the investigation. Mr. Martinez was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and he waived those rights. He also signed a declaration of rights form given to him by the Service.

While DHS searched his cell phone, the Service questioned Mr. Martinez about the purpose of his travels and the ivory pieces in his luggage. He said that he had purchased several statues during the COVID-19 pandemic and had traveled abroad to obtain them. His travels took him to Canada, France, Spain, and Belgium. He repeatedly denied, however, purchasing statues with ivory and again claimed that the pieces in his luggage were not ivory.

During the interview, Mr. Martinez explained that he had been an art dealer for more than 30 years. He demonstrated a clear understanding of CITES and the declaration and permit obligations for importing and exporting ivory. He also admitted that he had not declared the ivory pieces in his luggage and had not obtained any permits. He asserted that he never obtained the necessary CITES permits because he only transacted business in the United States, notwithstanding the ivory in his luggage.

Significantly, Mr. Martinez acknowledged that he was required to declare any ivory in his possession when entering or leaving the United States. The Service concluded the interview by giving him an opportunity to change any of his answers, which he declined to do. Following the interview, the Service seized the ivory pieces and tools and returned Mr. Martinez's cell phone after extracting its data for review.

After releasing Mr. Martinez, the Service obtained search warrants for his home and place of business. The searches resulted in the Service seizing 32 sculptures from his home and 195 sculptures from his place of business. All of them contained ivory. Three of those sculptures are pictured below:

 



## C

The operative indictment charged Mr. Martinez with eight counts of smuggling goods into the United States in violation of 18 U.S.C. §§ 545 and 2 and 50 C.F.R. §§ 14.52 and 14.61, three counts of smuggling goods outside of the United States in violation of 18 U.S.C. §§ 554 and 2 and 50 C.F.R. §§ 14.52 and 14.63, and two counts of obstruction of justice in violation of 18 U.S.C. §§ 1503(a). The government dismissed Count 14, one of the two obstruction of justice charges.

Mr. Martinez moved to dismiss the smuggling charges, arguing in part that two exceptions to the prohibition on importing and exporting ivory—the antique and de minimis exceptions—applied to the items he was charged with illegally smuggling. The government responded that those exceptions were inapplicable to the smuggling charges brought against him.

The district court denied the motion to dismiss, finding no merit to Mr. Martinez's argument that the exceptions "absolved him of [the] responsibility" to disclose the ivory. *See United States v. Martinez*, No. 22-cr-20137, 2022 WL 17100684, at *1 (S.D. Fla. Nov. 22, 2022). The court concluded that "these exceptions are not for individuals to freely decide for themselves that they can import or export whatever regulated items they please based on a self-diagnosis of exemption." *Id.* at *2. Rather, "[t]he regulated items must be declared for inspection and the required documentation . . . before there can be a determination of whether any such exceptions apply." *Id.*

In anticipation of Mr. Martinez raising the antique and de minimis exceptions at trial, the government filed a motion in limine in part seeking to exclude any evidence or testimony about either exception. The government argued that because the declaration and clearance of all imported and exported wildlife subject to CITES was mandatory, evidence related to either exception would not prove or disprove whether Mr. Martinez submitted the required declaration (Form 3-177) or whether the ivory he was importing had been cleared by the Service. Therefore, the government maintained, evidence related to either exception was inadmissible under Federal Rules of Evidence 401 and 403. Mr. Martinez countered that limiting evidence related to the two exceptions would prohibit him from fully and fairly presenting a defense. He further asserted that he did not smuggle ivory because the statues at issue fell within the two exceptions.

The district court granted the government's motion and precluded evidence or testimony related to antique and de minimis exceptions. The court concluded that "[w]hether any of the statues at issue qualify as antiques or contain de minimis amounts of ivory is of no consequence to whether [Mr. Martinez] made the proper declarations and filings."

## D

At trial, the government presented evidence and testimony about Mr. Martinez's smuggling activities and the Service's subsequent investigation. Despite the district court's ruling on the motion in limine, Mr. Martinez attempted throughout the trial to elicit

testimony from the government's witnesses regarding the antique and de minimis exceptions to the prohibition on the trade of ivory.

**1**

The government first introduced testimony regarding CITES and the Service's role in regulating the legal trade of wildlife, and stopping its illegal trade. This testimony also detailed the process for declaring and clearing the importation or exportation of wildlife—such as ivory—with the Service, which included explaining the Form 3-177 for declaring wildlife. The jury also learned of the origins of ivory, its composition, and methods for identifying it.

Several of the agents who were involved in the Service's investigation of Mr. Martinez's smuggling scheme also testified. The CBP agent who searched Mr. Martinez's luggage at the airport related that he found the ivory pieces and tools in the luggage, and told the jury about Mr. Martinez's denial that the pieces were ivory.

Service and DHS agents also testified about their interview of Mr. Martinez at the airport. The government introduced statements directly from the interview to establish, among other things, Mr. Martinez's experience in the industry, knowledge of CITES, understanding that he was required to declare ivory imported into or exported out of the United States, and admission that he failed

12                    Opinion of the Court                    23-10848

to make such declarations or seek the appropriate permits to trade in ivory.[2]

The agents further testified about executing the search warrants at Mr. Martinez's home and place of business.

**2**

The government introduced extensive evidence and testimony regarding the smuggling of each of the statues identified in the indictment.  The jury saw some of the statues containing ivory, as well as photographs of other statues.  Additional photographs showed Mr. Martinez with the statues or the shipping boxes in which they were smuggled into the United States.

In addition, the government introduced catalogs from international auction houses where Mr. Martinez purchased statues. The catalogs indicated that the statues contained ivory and that the United States largely banned the importation of ivory.

The jury heard evidence of communications between Mr. Martinez and buyers or sellers negotiating the sale of the statues. Some of the communications helped establish that Mr. Martinez was aware that the statues contained ivory, that on at least one occasion he was told by an international seller that it was illegal to import ivory into the United States, and that he first shipped statues

_____

[2] The district court did not permit Mr. Martinez to introduce certain other statements he made during the interview.  We address those statements later.

to friends internationally before smuggling them into the United States.

There was also evidence concerning the sale or purchase of the statues. Some of the invoices for the statues indicated that the statues contained ivory.

All this evidence allowed the jury to find that Mr. Martinez carried out an elaborate smuggling scheme involving the international purchase, sale, and transportation of statues containing ivory into and out of the United States without making the required declarations.

**3**

The jury also heard testimony regarding Mr. Martinez's attempts to obstruct justice with respect to one of the government's witnesses, Waltford Gonzalez.

Mr. Gonzalez met Mr. Martinez through a previous employer. Mr. Martinez later established a consignment relationship with Mr. Gonzalez's gallery to sell pieces he provided. For his role, Mr. Martinez would retain a portion of the profits in return. Mr. Martinez's inventory, which Mr. Gonzalez would keep in his gallery, consisted in part of statues made of bronze and ivory.

Mr. Martinez and Mr. Gonzalez had several interactions following the search and interview of Mr. Martinez at the airport. Immediately following the incident, Mr. Martinez contacted Mr. Gonzalez to tell him what had happened and to explain that he had been stopped because of the ivory. Mr. Gonzalez later retrieved

14                    Opinion of the Court                    23-10848

statues belonging to his previous employer at Mr. Martinez's request after learning of the search warrants but before their execution.

After the search warrants were executed, Mr. Martinez visited Mr. Gonzalez's gallery to coordinate what he and Mr. Gonzalez would say to law enforcement. Although Mr. Martinez did not specify what testimony he wanted to coordinate, Mr. Gonzalez "was very clear that [he] said look, I'm not going to lie, and if they ever come here, I'm not going to -- you know, I'm going to tell the truth. I'm going to tell them what I know of the situation." Mr. Gonzalez's sales associate, who was present during the conversation, confirmed at trial that Mr. Gonzalez had rebuffed Mr. Martinez's request to lie to the government. In another conversation, Mr. Martinez warned Mr. Gonzalez to not trust government agents with whom he interacted because they were not his friends.

Mr. Gonzalez also recounted an interaction in which Mr. Martinez appeared at the gallery unannounced. Mr. Martinez presented an old invoice from the gallery and asked if he could claim that it was for the sale of one of the seized statues. The invoice is pictured below:

Mr. Gonzalez testified that the invoice related to a 2020 sale of commissioned watercolor paintings, but Mr. Martinez had requested at the time that the invoice state that the sale was for an unidentified art deco sculpture. After researching the invoice, Mr. Gonzalez informed Mr. Martinez that the gallery had never purchased the seized statue he sought to use the invoice for and had no record of doing so. Mr. Martinez responded by pleading for Mr. Gonzalez to help because he was "very distressed by the entire situation" and was "very worried that he was going to lose all these pieces."

**4**

The jury convicted Mr. Martinez on all charges except for Counts 5, 9, and 11, on which it acquitted him. Martinez filed a post-trial motion for judgment of acquittal, requested a new trial in the alternative, and asked to be released pending his sentencing and appeal. Mr. Martinez argued that he could not present a complete defense because the district court did not permit him to present evidence on the antique and de minimis exceptions and did not permit the introduction of the entire transcript of his airport interview. He also argued that the government failed to prove the obstruction of justice charge because it did not establish that he had notice of the grand jury proceedings or that his actions had obstructed the investigation. The court denied the motions.

**E**

The probation officer calculated Mr. Martinez's total offense level under the Sentencing Guidelines to be 24. The total offense level consisted of a base offense level of 6 under U.S.S.G. § 2Q2.1(a) and enhancements of 2 levels because the smuggling offenses were for pecuniary gain or otherwise involved a commercial purpose; 14 levels because the total market value of the statues containing ivory exceeded $550,000 but did not exceed $1,500,000; and 2 levels for obstruction of justice. The probation officer, using the methodology proposed by the government, calculated the total market value of the 22 statues containing ivory to be $592,906 and provided estimated market values for each of them. *See* U.S.S.G. § 2Q2.1(b)(3)(A)(ii).

Because Mr. Martinez had no criminal history points, his criminal history category was I.  Together, his total offense level and criminal history category resulted in an advisory guideline imprisonment range of 51 to 63 months.

During the sentencing hearing, Mr. Martinez raised several objections to the presentence investigation report.  As relevant to this appeal, Mr. Martinez objected to the valuation of the statues, arguing that their actual total market value was $121,000.  Specifically, Mr. Martinez argued that the statues that were not sold should have been valued at their fair market value (as determined by his own expert) rather than the price at which he offered them for sale.  He also attempted to present testimony from his expert to support his valuation.  The district court admitted the expert's report but rejected Mr. Martinez's valuation argument and adopted the valuation set out in the report.

The district court sentenced Mr. Martinez to 51 months' imprisonment on each of the counts of the conviction, with the terms to be served concurrently.  The court also sentenced Mr. Martinez to a term of supervised release of three years on each of the counts, also to run concurrently.

## II

Mr. Martinez contends that the district court improperly precluded him from presenting evidence regarding the antique and de minimis exceptions to the prohibition on importing or exporting ivory.  The thrust of his argument is that he needed to introduce this evidence to counter the government's contention that he had

18                    Opinion of the Court                    23-10848

the required knowledge or intent to commit the smuggling offenses.  We are unpersuaded.[3]

## A

We review a district court's grant of a motion in limine for abuse of discretion.  *See United States v. Estrada*, 969 F.3d 1245, 1261 (11th Cir. 2020).  The abuse of discretion standard gives the district court a "wide range of choice."  *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1623 (2025) (internal quotation marks and citation omitted).  We will therefore "affirm unless we find that the . . . court has made a clear error of judgment, or has applied the wrong legal standard."  *United States v. Lyons*, 403 F.3d 1248, 1255 (11th Cir. 2005) (citation and internal quotation marks omitted).  Our analysis entails consideration of the smuggling statutes and regulations Mr. Martinez was charged with violating, and our interpretation of them is plenary.  *See Grigsby*, 111 F.3d at 816.

---

[3] Mr. Martinez does not raise a sufficiency challenge to any of his smuggling convictions under 18 U.S.C. §§ 545 and 554(a).  Nor does he contest any of the jury instructions for those charges.  We therefore do not address whether the regulations requiring that wildlife subject to the ESA and CITES be declared when imported into the United States are "laws" for purposes of 18 U.S.C. § 545.  *Cf. United States v. Izurieta*, 710 F.3d 1176, 1184 (11th Cir. 2013) ("While some regulations may fall under the criminal prohibitions of 18 U.S.C. § 545, the text of 19 C.F.R. § 141.113(c) along with the comments issued during its promulgation certainly indicate to the average person that liability is strictly civil and monetary . . . and is not aimed at punishment.").

**B**

To import or export wildlife—including ivory—into or out of the United States, an officer from the Service must clear the wildlife. *See* 50 C.F.R. § 14.52(a). *See also* 50 C.F.R. § 10.12 (defining "wildlife"); 50 C.F.R. § 17.40(e) (providing specific rules for the African elephant). An importer or exporter may obtain clearance at designated ports and must submit certain documents to receive clearance. *See* 50 C.F.R. §§ 14.52(b) & (c).

In addition to being subject to potential inspection, wildlife which is imported or exported must be declared. *See* 50 C.F.R. § 14.51 (inspection of wildlife); 50 C.F.R. § 14.61 (import declaration requirements); 50 C.F.R. § 14.63 (export declaration requirements). For example, one of the relevant regulations, § 14.61, states that "[e]xcept as otherwise provided by the regulations of this subpart, importers or their agents must file with the Service a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3–177), signed by the importer or the importer's agent, upon the importation of any wildlife at the place where Service clearance . . . is requested." Although the regulations provide certain exceptions to the declaration and clearance requirements, those exceptions do not apply to "wildlife requiring a permit pursuant to part 17 and 23 of this subchapter B . . . ." 50 C.F.R. §§ 14.55, 14.62(a), & 14.64(a).

Mr. Martinez attempted to introduce evidence regarding two importation and exportation exceptions related to ivory from African elephants: (1) the antique exception, 50 C.F.R. § 17.40(e)(9),

20                    Opinion of the Court                    23-10848

and (2) the de minimis exception, 50 C.F.R. § 17.40(e)(3). We describe those exceptions below.

The Service promulgates lists of endangered and threatened wildlife and has determined, consistent with CITES, that the African elephant is threatened. *See* 50 C.F.R. § 17.11(a) & (h). Generally, the Director of the Service may issue a permit for any activity otherwise prohibited with regard to threatened species of wildlife. *See* 50 C.F.R. § 17.32. Prohibited activities and general permit requirements for prohibited activities apply to African elephants. *See* 50 C.F.R. § 17.40(e). *See also* 50 C.F.R. § 17.31 (prohibited activities); 50 C.F.R. § 17.32 (permit requirements for prohibited activities). The regulations also include species-specific rules and exceptions that apply to the African elephant, including ivory derived from African elephant tusk. *See* 50 C.F.R. § 17.40(e).

Antiques containing or consisting of ivory may be imported into or exported out of the United States without a threatened species permit. *See* 50 C.F.R. § 17.40(e)(9). The antique, however, must satisfy the definitional criteria under § 10(h) of the Endangered Species Act, codified at 16 U.S.C. § 1539(h), as well as the clearance and declaration requirements in 50 C.F.R. §§ 14.52, 14.61, and 14.63. *See* 50 C.F.R. § 17.40(e)(9). Persons seeking to benefit from the antique exception for ivory must demonstrate that they meet the criteria for the exemption. *See* 50 C.F.R. § 17.40(e).

Certain manufactured or handcrafted items containing de minimis amounts of ivory are also excepted from the general prohibition on the trade in ivory, so long as certain criteria are met. *See*

50 C.F.R. § 17.40(e)(3)(i)–(vii).  As with the antique exception, persons seeking to benefit from the de minimis exception must demonstrate that they meet the criteria for the exception.  *See* 50 C.F.R. § 17.40(e).

At bottom, the importation or exportation of wildlife—including ivory—must be declared by the importer or exporter and cleared by the Service.  And the persons seeking to benefit from the exceptions must demonstrate that they satisfy the requisite criteria.  Otherwise, a threatened wildlife permit must be obtained from the Director of the Service.

The government charged Mr. Martinez not with illegal importation or exportation of ivory, but rather with smuggling ivory into and out of the United States in violation of 18 U.S.C. §§ 545 and 554(a).  Both of these statutes make it unlawful to knowingly, willfully, and fraudulently import or export items like ivory without declaring them.  *See* § 545 (making it a felony to "fraudulently or knowingly import[ ] or bring[ ] in the United States, any merchandise contrary to law, or receive[ ], conceal[ ], buy[ ], sell[ ], or in any manner facilitate[ ] the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought in the United States contrary to law"); § 554(a) (making it a felony to "fraudulently or knowingly . . . receive[ ], conceal[ ], buy[ ], sell[ ], or in any manner facilitate[ ] the transportation, concealment, or sale of such merchandise, article or object, prior to exportation").

For these smuggling charges, the crime is the failure to declare with the requisite mens rea. *See United States v. Plummer*, 221 F.3d 1298, 1302 (11th Cir. 2000) (setting out the elements of a § 545 violation); *United States v. Al Jaberi*, 97 F.4th 1310, 1322–23 (11th Cir. 2024) (summarizing evidence which was sufficient to support a conviction under § 554(a)). Thus, the ultimate importability or exportability of an item does not affect or eliminate the obligation to declare the item. *See United States v. Richardson*, 588 F.2d 1235, 1238 (9th Cir. 1978) ("[O]ne bringing goods into the country who fails to properly declare or present the goods as required . . . violates 18 U.S.C. § 545, whether importation of the merchandise was legal or illegal."); 3 Joel M. Androphy, White Collar Crime § 24:9 (3d ed. Feb. 2023 update) ("The difference between smuggling and illegally importing is that smuggling requires the knowing and surreptitious bringing of goods into the U.S. with the intent to defraud the government by failing to properly declare or present the goods as required . . . , whether importation of the merchandise is legal or illegal."); 50 C.F.R. § 23.92(b) ("For specimens that are exempt from CITES requirements, you must still follow the clearance requirements for wildlife in part 14 of this subchapter[.]").

## C

In its motion in limine, the government sought to preclude evidence and testimony related to the antique and de minimis exceptions pursuant to Federal Rules of Evidence 401 and 403. In granting the motion, the district court concluded that "[w]hether any of the statues at issue qualify as antiques or contain de minimis

amounts of ivory is of no consequence to whether [Mr. Martinez] made the proper declarations and filings."

Mr. Martinez argues that such evidence and testimony was necessary to show that he lacked the requisite knowledge or intent. Rule 401 provides that "[e]vidence is relevant if it has any tendency to make a material fact more or less probably than it would be without evidence." *United States v. Lewis*, 40 F.4th 1229, 1245 (11th Cir. 2022). And Rule 403 allows a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing of the issues, or misleading the jury." *Id.* (citing Fed. R. Evid. 403).

We conclude that the district court did not abuse its discretion. As the court astutely noted, Mr. Martinez was not relieved of his obligation to declare the statues containing ivory simply because they may have qualified for one of the two import/export exceptions. *See, e.g., Richardson*, 588 F.2d at 1238. The Service, after all, cannot determine whether either exception applies if it does not know that restricted items are being brought into or sent out of the United States, and Mr. Martinez could not decide for himself that his statues came within one or both of the exceptions. *See Martinez*, 2022 WL 17100684, at *1–2. Mr. Martinez, moreover, admitted during the interview at the airport that he knew he was required to declare ivory imports and displayed an understanding of CITES. Evidence or testimony as to the applicability of either exception was therefore irrelevant to the smuggling charges brought against him. As the Supreme Court explained almost a century ago

with respect to a predecessor smuggling statute, a person "c[an] not get rid of the duty [to disclose items] by hiding them in his stockings and other personal luggage." *United States v. Ritterman*, 273 U.S. 261, 269 (1927).

## III

Mr. Martinez challenges the district court's ruling excluding six additional portions of his interview with Service and DHS agents at the airport. He argues that those excluded portions should have been admitted at trial under the rule of completeness embodied in Rule 106 of the Federal Rules of Evidence.

## A

We review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Langford*, 647 F.3d 1309, 1319 (11th Cir. 2011). We will not reverse an erroneous evidentiary ruling if it is harmless, "meaning that the party asserting error has not shown prejudice to a substantial right." *United States v. Jeri*, 869 F.3d 1247, 1259 (11th Cir. 2017) (quoting *United States v. Burston*, 159 F.3d 1328, 1336 (11th Cir. 1998)).

## B

At trial, the government introduced certain audio clips of Mr. Martinez's interview at the airport and a transcript containing those portions of the interview. Prior to the government presenting the audio clips to the jury, Mr. Martinez moved to admit the entire interview transcript into evidence, a request the district court denied. Mr. Martinez then sought to admit specific

23-10848                    Opinion of the Court                    25

additional portions of the interview to supplement the audio clips and transcript that would be presented to the jury.

Mr. Martinez challenges the district court's refusal to admit six additional statements from the interview. Those six statements are as follows.[4]

*Statement 1:*

> Agent: But it is very important that, you know, when you enter or leave the country with ivory, you must declare it.
>
> Martinez: I know.
>
> **Agent: Okay. So, you knew.**
>
> **Martinez: But I've had cases…**
>
> **Agent: Yes**
>
> **Martinez: I've had cases of clients that have taken pieces and there, at Customs, they've been held, with complete figures, and they've proven that the piece is over one hundred years old and they've not had any problem.**
>
> **Agent: (Nods.). Okay.**
>
> **Martinez: The problem is with new ivory, Chinese things, and the like. That is a real problem because they are things made of new things.**

---

[4] We follow the format used by Mr. Martinez in Addendum 4 of his initial brief. The portions of the transcript that were admitted into evidence are in regular text while the portions Mr. Martinez unsuccessfully sought to introduce are in bold.

*Statement 2*:

> Agent: So, you understand everything about CITES, you know.
>
> Martinez: I do, I do.
>
> **Agent: … that you must declare.**
>
> **Martinez: I also understand that if I had… now when I am at this situation, I can prove it is one hundred years old and I'm not going to have any problem. Because with the help of experts, I can prove it is an antique with one hundred per cent certainty, and I'm not going to have problems because it is no[t] new.**

*Statement 3*:

> **Agent: And, are there other, you know, other people here in South Florida selling things, like ivory and bronze pieces?**
>
> **Martinez: There are many… there are many dealers who sell this. In Florida, it's not unlawful to sell this.**
>
> **Agent: No, no, of course.**
>
> **Martinez: No, no.**
>
> **Agent: I'm not saying…**
>
> **Martinez: In New York it is illegal. In New York and California.**
>
> **Agent: Yes. You're very knowledgeable. You know a lot about your…**

**Martinez:** Yes, but new things made of ivory. Because, again, they are antiques. That's the law, I read it. Pieces that are over one hundred years old can be traded.

**Agent:** Even for selling in New York.

**Martinez:** So, if you live in New York, you can come here to Miami, buy it and take it to New York with you and have it for yourself. What you can't do in New York is selling it, trading it.

**Agent:** Having it for yourself.

**Martinez:** Yes.

**Agent:** But that's the point. You're in the business.

**Martinez:** You don't understand.

**Agent:** You understand the law very well.

**Martinez:** I know because I found…

**Agent:** No, that's the law, that's the law.

**Martinez:** It's written. I didn't make this up.

**Agent:** No, I can read very well, but as I'm telling you, it doesn't matter.

**Martinez:** That piece never… believe me… I'm going to find experts who can say those pieces are over one hundred years old and so I can have them with me on the plane or bring them in without any problem.

*Statement 4*:

> **Martinez: I don't know. Whatever you want, but really, I'm going to prove it's an antique and nothing's going to happen to me.**

*Statement 5*:

> **Agent: And the thing is that it won't matter because you have knowledge of the CITES, and you're trading abroad…**
>
> **Martinez: It doesn't matt… I can make it retroactive in a second.**
>
> **Agent: No, Martinez, Mr. Martinez, Mr. Martinez. I'm helping you.**
>
> **Martinez: I'm telling you.**
>
> **Agent: If you're bringing a piece made of ivory, do you know why is ivory protected? Let me ask you.**
>
> **Martinez: But modern.**
>
> **Agent: Do you know why is ivory protected?**
>
> **Martinez: But modern.**
>
> **Agent: Modern ivory.**
>
> **Martinez: For the protection of elephants. Not there.**
>
> **Agent: So, yes.**
>
> **Martinez: But this was done one hundred and twenty years ago.**
>
> **Agent: Yes, but this…**
>
> **Martinez: It's not within the jurisdiction.**

*Statement 6*:

> **Agent: The problem is that, as you've said, you have never gotten a CITES.**
>
> **Martinez: No, because I sell it locally.**
>
> **Agent: Okay, but that's the problem. You've never... I don't know. You know a lot about CITES, but I don't think... I'm not sure if you understand it very well or what.**
>
> **Martinez: No, the clients... the clients... no, I understand that.**
>
> **Agent: (Nods.)**
>
> **Martinez: The clients buy the pieces and have them for their apartments here and when they're going to export them, they take their permits and take them abroad legally.**
>
> **Agent: (Nods.)**
>
> **Martinez: That's the way it works. A hundred per cent.**
>
> **Agent: I don't have to tell you anything.**
>
> **Martinez: If you want, read the law, read the articles and I'm going to prove these pieces are antique. And I'm going to get a CITES and...**

### C

The rule of completeness is embodied in Federal Rule of Evidence 106. At the time of the trial, Rule 106 provided that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any

30                    Opinion of the Court                    23-10848

other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[5]

Rule 106 prevents "the misleading impression created by taking matters out of context" and "the inadequacy of repair work when delayed to a point later in the trial." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988). It "applies when a party introduces only part of a writing or recorded statement, and it allows the opposing party to introduce other portions of that writing or recorded statement that 'in fairness ought to be considered at the same time.'" *United States v. Macrina*, 109 F.4th 1341, 1347 (11th Cir. 2024) (quoting Fed. R. Evid. 106). But it "does not automatically make the entire document admissible." *Pendas-Martinez*, 845 F.2d at 944. Only "additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced" is admissible. *See Langford*, 647 F.3d at 1330 (quoting *Pendas-Martinez*, 845 F.2d at 944).

Statements 1 and 2 seem to satisfy Rule 106. Both statements were relevant because they "place[d] into context" Mr. Martinez's initial "I know" and "I do" responses to an agent's questions about the obligation to declare, and the government introduced

---

[5] Rule 106 was amended, effective December 1, 2023, to read: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." We apply the version of Rule 106 in effect at the time of the trial. *See United States v. Verdeza*, 69 F.4th 780, 791 (11th Cir. 2023) (considering the version of Rule 404(b) which was in effect at the time of the defendant's trial).

those responses at trial. *See United States v. Verdugo*, 617 F.3d 565, 579 (1st Cir. 2010) ("The rule of completeness ordinarily comes into play when a statement is offered to explain another statement that is being admitted into evidence.").

We need not decide whether the district court abused its discretion in excluding Statements 1 and 2. To obtain a reversal of his smuggling convictions, Mr. Martinez must show that his substantial rights were prejudiced (i.e., adversely affected) by the district court's ruling, and he has not done so. *See Burston*, 159 F.3d at 1336. Statements 1 and 2 do not refute Mr. Martinez's admitted knowledge of the obligation to declare imported or exported ivory or his failure to submit the required declarations. Statements 1 and 2 only alluded to the antique exception, which as we have explained is irrelevant to the obligation to declare. Moreover, the government presented ample evidence to establish Mr. Martinez's smuggling scheme and mens rea. *See id.* (concluding that the erroneous exclusion of evidence was harmless error because "the [g]overnment's case was strong enough to support [the defendant's] conviction"). Therefore, any error in excluding Statements 1 and 2 was harmless.

As for Statements 3, 4, 5, and 6, Mr. Martinez fails to persuasively explain why they should have been admitted under Rule 106. Beyond making a conclusory claim that the statements reflected his belief that he did nothing wrong, he does not say why they are "necessary to qualify, explain, or place into context the portion[s] already introduced." *Pendas-Martinez*, 845 F.2d at 944. Arguments

raised in such a "perfunctory manner without supporting argu-
ments and authority [are] abandoned." *Sapuppo v. Allstate Floridian
Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)

In any event, Statements 3, 4, 5, and 6 bear no relation to the
portions of the interview that the government introduced and pre-
sented to the jury. These four statements, which are stand-alone
portions of the interview, also fail to provide necessary context to
any previously admitted statements. *See Langford*, 647 F.3d at 1330
(holding that there was no abuse of discretion where the defendant
had "not shown how the proffered testimony was 'necessary to
qualify, explain, or place into context the portion already intro-
duced'") (quoting *Pendas-Martinez,* 845 F.2d at 944); *United States v.
Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (holding that exclusion
was not an abuse of discretion because the defendant failed to show
"how additional material would 'qualify, explain, or place into con-
text' the portion admitted into evidence").

At the time of trial, Rule 106 did "not entitle [a] defendant to
introduce portions of his statement that are neither explanatory of
nor relevant to the portions of the statement introduced by the
prosecution." *United States v. Myers*, 972 F.2d 1566, 1576 (11th Cir.
1992). We discern no abuse of discretion by the district court in
excluding Statements 3, 4, 5, and 6.[6]

---

[6] To the extent that Mr. Martinez argues that his Sixth Amendment rights were
violated by the district court's exclusion of Statements 1 through 6, we reject
the contention. Mr. Martinez did not assert a Sixth Amendment claim below,

## IV

Mr. Martinez attacks his obstruction of justice conviction on Count 13 on sufficiency grounds. He argues that the government failed to prove that he obstructed justice with respect to Mr. Gonzalez. We disagree.

We review challenges to the sufficiency of the evidence *de novo*, "examining the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility issues in favor of the guilty verdicts." *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1203 (11th Cir. 2009). "The question is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mapson*, 96 F.4th 1323, 1336 (11th Cir. 2024).

Mr. Martinez was charged under the omnibus clause of the obstruction of justice statute, 18 U.S.C. § 1503(a). That clause makes it a felony to "corruptly or by threats or force, or by any threatening letter or communication, influence[ ], obstruct[ ], or impede[ ], or endeavor[ ] to influence, obstruct, or impede, the due administration of justice . . . ." We have previously held that the omnibus clause "is broad enough to encompass any act committed corruptly, in an endeavor to impede or obstruct justice." *United States v. Thomas*, 916 F.2d 647, 650 (11th Cir. 1990) (citation and internal quotation marks omitted). But there must be a "nexus"

---

and in any event the district court did not preclude him from presenting a defense to the jury.

between "the accused's actions and the relevant judicial proceedings"—namely, "'a relationship in time, causation, or logic with the judicial [or grand jury] proceedings' at issue in the case." *United States v. Beach*, 80 F.4th 1245, 1256 (11th Cir. 2023) (quoting *United States v. Aguilar*, 515 U.S. 593, 599–600 (1995)).

To convict Mr. Martinez of obstruction of justice, the government had to prove beyond a reasonable doubt that he "(1) corruptly or by threats, (2) endeavored, (3) to influence, obstruct, or impede the due administration of justice." *Thomas*, 916 F.2d at 651. Although the government did not have to show that Mr. Martinez succeeded in his efforts, it had to prove that he attempted—i.e., endeavored—to do so. *See id.* ("The defendant's conduct must be such . . . that its natural and probable effect would be the interference with the due administration of justice."). The government also had to demonstrate that Mr. Martinez "knowingly and intentionally undertook an action from which an obstruction of justice was a reasonably foreseeable result." *Id.* (stating that the government "must establish that the conduct was prompted, at least in part, by a corrupt motive") (citation and internal quotation marks omitted).

A reasonable jury could have found that Mr. Martinez obstructed justice based on his interactions with Mr. Gonzalez. For example, Mr. Martinez asked Mr. Gonzalez to become complicit in his scheme to misrepresent what the already-inaccurate 2020 invoice was for. Even though the invoice was originally inaccurate because it referenced an art deco sculpture instead of watercolor

paintings, Mr. Martinez sought Mr. Gonzalez's agreement to misrepresent that the invoice was for one of the statues that had been seized. A jury could view that act as an attempt to obstruct the administration of justice. *See United States v. Macari*, 453 F.3d 926, 940 (7th Cir. 2006) (evidence that the defendant asked a potential witness to lie to the grand jury supported a conviction for obstruction of justice under § 1503); *United States v. Petzold*, 788 F.2d 1478, 1485 (11th Cir. 1986) (upholding an obstruction of justice conviction under § 1503 based on the defendant's "creation of [a] paper trail made up of fictious transactions").

　　We affirm Mr. Martinez's conviction on Count 13.

## V

　　Mr. Martinez asserts that he was denied a fair trial due to certain statements made by the government during closing argument. Because he did not object to these statements below, our review is for plain error. *See United States v. Maradiaga*, 987 F.3d 1315, 1324 (11th Cir. 2021).

　　We begin with the government's opening remarks during closing argument:

> *Ladies and gentlemen of the jury, the Defendant is no longer presumed innocent.* The Defendant stands before you guilty as charged in the superseding indictment. Guilty of smuggling sculptures containing ivory outside of the United States, guilty of selling sculptures intended for export outside of the United States, and guilty of obstructing justice.

D.E. 202 at 35–36 (emphasis added).

The district court had advised the jury prior to the parties' closing arguments that "the [g]overnment has the burden of proof, which never shifts," and reminded the jury again following closing arguments that "the burden . . . never shifts from the [g]overnment. The [g]overnment has the burden of proof to prove their case beyond a reasonable doubt. It's not the Defendant's job to disprove anything."

Plain error occurs where (1) there is an error; (2) the error is plain or obvious; and (3) the error affected the defendant's substantial rights. *See Rosales-Mireles v. United States*, 585 U.S. 129, 134–35 (2018). If a defendant makes the required showing, an appellate court should correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 135. "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). An error can be harmless "[w]hen the record contains sufficient independent evidence of guilt." *Id.*

"The presumption of innocence, although not articulated in the Constitution, is a basic component of our system of criminal justice." *United States v. Dawson*, 563 F.2d 149, 151 (5th Cir. 1977) (citations omitted). It is "[i]mplicit in the concept of [a] fair trial." *United States v. Harris*, 703 F.2d 508, 510 (11th Cir. 1983). *See also United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994) ("The

presumption of innocence is undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.") (citation and internal quotation marks omitted).

Significantly, the presumption of innocence "disappears [only] when a verdict of guilty, supported by substantial evidence, is returned against the defendant." *Bradford v. United States*, 129 F.2d 274, 277 (5th Cir. 1942). As the Eighth Circuit has put it, "the presumption of innocence 'remains with the defendant through every stage of the trial, most importantly, the jury's deliberations' and . . . the presumption is 'extinguished only upon the jury's determination of guilt beyond a reasonable doubt.'" *United States v. LaFontaine*, 847 F.3d 974, 979 (8th Cir. 2017) (citation omitted).

The government's statement that Mr. Martinez was "no longer presumed innocent" was improper and constituted error that was plain under our precedent. That statement misstated the law, i.e., the principle that a defendant is presumed innocent until the jury returns a verdict of guilty. *See Bradford*, 129 F.2d at 277. The Eighth and Tenth Circuits have held that similar statements are improper, and we agree with them. *See United States v. Marin*, 31 F.4th 1049, 1055–56 (8th Cir. 2022); *United States v. Starks*, 34 F.4th 1142, 1158–59 (10th Cir. 2022).

Nevertheless, the error did not adversely affect Mr. Martinez's substantial rights. First, the "record contain[ed] sufficient" and ample "independent evidence of guilt." *Eckhardt*, 466 F.3d at 947. The smuggling scheme was extensive; Mr. Martinez admitted

to knowing the declaration requirements for importing and exporting ivory, yet failed to declare the substantial number of statues with ivory that he imported and exported; and Mr. Martinez tried to get Mr. Gonzalez to help him deceive the government about the 2020 invoice. Second, the district court told the jury both before and after closing arguments that the burden remained on the government throughout the trial. Mr. Martinez is therefore not entitled to reversal.

There was no error, however, in the government's later characterization of Mr. Martinez's statements at the airport as "admit[ting] to committing the crime in Count 6." "[A]lthough a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence." *Reeves*, 742 F.3d at 505. And "[p]rosecutors are not forbidden from using colorful and perhaps flamboyant remarks when the evidence supports them." *United States v. Cooper*, 926 F.3d 718, 739 (11th Cir. 2019) (citation and internal quotation marks omitted).

Mr. Martinez was given the opportunity to declare the three ivory pieces found in his luggage, but he claimed to not have ivory to declare. And he acknowledged knowing that he had to declare ivory being brought into or out of the United States. Viewing the prosecutor's argument that Mr. Martinez "admitted to committing the crime in Count 6" in the context of the entire trial, the statement can be viewed as a "conclusion drawn from the trial evidence." *Reeves*, 742 F.3d at 505.

## VI

Mr. Martinez also attacks his sentence of 51 months' imprisonment.  First, he challenges the evidence on which the district court relied to calculate the value of the statues at issue.  Second, he takes issue with the method the court used to calculate the value of the statues, as well as its ultimate valuation.  We find no merit in these arguments.

## A

Mr. Martinez argues that his due process rights were violated because he was not allowed to confront the government's valuation of the statues by presenting live testimony from his expert.  He also contends that the district court failed to meaningfully consider his expert's report on valuation.  The government points to the report's purported lack of reliability and notes that the court admitted and considered the report despite not allowing the expert to testify.

Rule 32(i)(2) of the Federal Rules of Criminal Procedure provides that at sentencing the district court "may permit the parties to introduce evidence on the objections" to the presentence investigation report.  *See United States v. Jordan*, 582 F.3d 1239, 1249 n.21 (11th Cir. 2009) ("Among the rights Rule 32 affords the parties at sentencing is the right to introduce evidence relating to an objection to the presentence [investigation] report or an objection made during the sentencing hearing[.]").  And we have held that a defendant must be "afforded the opportunity to refute the

information brought against him at sentencing." *United States v. Giltner*, 889 F.2d 1004, 1008 (11th Cir. 1989).

Although due process generally does not require that a defendant be allowed to call a witness to refute or rebut information at sentencing, *see id.*, there may be circumstances where a defendant must be permitted to call a witness—for example, in a situation where only a witness can refute or rebut the evidence presented by the government to support a disputed sentencing enhancement. At bottom, "the sentencing process is not a [full-blown] trial. Its purpose is to ensure that the district court is sufficiently informed to enable it to exercise its sentencing discretion in an enlightened manner." *United States v. Rogers*, 989 F.3d 1255, 1264 (11th Cir. 2021) (quoting *United States v. Stephens*, 699 F.2d 534, 537 (11th Cir. 1983)).

We see no due process violation or abuse of discretion here. First, the government did not present a valuation expert, and relied on the valuation it prepared for the probation officer and which was supported by evidence presented at trial and reflected in the presentence investigation report. Second, although it did not permit Mr. Martinez's expert to testify, the district court ultimately admitted her report into evidence. In doing so, the court heard argument from both parties regarding the expert's valuation of the statues and the disputed reliability of the report. Because "the [court] had adequate, reliable information to sentence [Mr. Martinez,] . . . [it] did not abuse its discretion when it refused to grant [him] an evidentiary hearing [on valuation] and, consequently, [he]

23-10848                Opinion of the Court                41

was not denied due process." *Giltner*, 889 F.2d at 1009.  *See also id.* ("[W]e affirm the district court's discretion to control the form of the rebuttal to challenged information.").

**B**

Mr. Martinez argues that the district court improperly calculated the value of some of the unsold statues under U.S.S.G. § 2Q2.1.  Specifically, he maintains that the price he listed for the unsold statues did not represent the fair market value of those statues.[7]

**1**

According to the Sentencing Guidelines' Statutory Index, violations of 18 U.S.C. § 545 are covered by three possible provisions: § 2B1.5 (as relevant here, for offenses involving the unlawful sale, purchase, exchange, transportation, or receipt of cultural heritage resources or paleontological resources), § 2Q2.1 (for offenses involving fish, wildlife, and plants), and § 2T3.1 (for offenses involving evading import duties or restrictions (smuggling) and receiving or trafficking in smuggled property).  Violations of 18 U.S.C. § 554

---

[7] In his brief, Mr. Martinez also asserts in a conclusory manner and without any citation to authority (a) that the valuation should not have been based on the statues as completed works of art because they only contained small amounts of ivory, (b) that acquitted conduct should not have been taken into account, and (c) that his sentence is unreasonable.  We deem these arguments abandoned due to insufficient briefing.  *See Sapuppo*, 739 F.3d at 682 (an appellant abandons an issue when he includes only "passing references" to it and "makes no argument and cites no authorities" in support).

are covered by four possible provisions: § 2B1.5 (described above), § 2M5.1 (for offenses involving the evasion of export controls or financial transactions with countries supporting international terrorism), § 2M5.2 (for offenses involving exportation of arms, munitions, or military equipment without the required validated export license), and § 2Q2.1 (described above). *See* U.S.S.G. App. A.

When the Statutory Index lists more than one provision for a particular statute, a court's task is to "determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2, cmt. (n.1). The probation officer used § 2Q2.1 as the applicable provision for Mr. Martinez's smuggling offenses, *see* PSI at ¶ 45, and neither side objected to the use of that provision in the district court or on appeal. We therefore apply § 2Q2.1 here. *See United States v. Norris*, 452 F.3d 1275, 1280-82 (11th Cir. 2006) (applying § 2Q2.1 to a conspiracy to smuggle orchids in violation of 18 U.S.C. § 545); *United States v. Kuba*, 495 F. App'x 197, 199 (2d Cir. 2012) (applying § 2Q2.1 to the smuggling of ivory in violation of 18 U.S.C. § 545).

For offenses involving wildlife (or fish or plants), § 2Q2.1(a) provides a base offense level of 6. If the "market value" of the wildlife exceeds $6,500, the base offense level is increased by the number of levels from the table in § 2B1.1(b)(1). *See* § 2Q2.1(b)(3)(A)(ii). "The enhancement provision in [§] 2Q2.1 instructs a sentencing court to base the enhancement on the market value or the fair-market retail price of the endangered species involved, not on the

economic loss caused by an offense." *United States v. Koczuk*, 252 F.3d 91, 96 (2d Cir. 2001). Because Mr. Martinez objected to the valuation which led to the 14-level enhancement, the government's burden was to establish the valuation by the preponderance of the evidence. *See United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013).

"When information is reasonably available," the "market value" of wildlife is "based on the fair-market retail price." § 2Q2.1 cmt. (n.4) (emphasis removed). But when the "fair-market retail price is difficult to ascertain, the [district] court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (*e.g.*, taxidermy) cost." *Id.* "Market value, however, shall not be based on measurement of aesthetic loss[.]" *Id.*

The Sentencing Guidelines do not define the terms "market value" or "fair-market retail price" for purposes of § 2Q2.1. When terms are undefined in a statute, regulation, rule, or guideline, "we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). The legal definition of "fair market value" is the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction." Black's Law Dictionary 1871 (12th ed. 2024). *See also* II Bouvier's Law Dictionary 2927 (Desk Edition 2012) ("[W]hat a willing buyer would pay in cash to a willing seller for property at a given time."). The Tenth Circuit has used this ordinary meaning in applying § 2Q2.1. *See United States v. Butler*, 694 F.3d 1177, 1181 (10th Cir. 2012)

("In ordinary usage, the phrase 'fair-market retail price' is most naturally read as the price a willing buyer would pay to a willing seller . . . ."). We will do so as well.

The valuation analysis here is complicated because the valuation is not of the ivory itself but of statues—works of art that contain ivory. And art "is particularly difficult to value because of the multitude of factors that may affect its value." John G. Steinkamp, *Fair Market Value, Blockage, and the Valuation of Art*, 71 Denver U. L. Rev. 335, 398 (1994).

**2**

"We review *de novo* the interpretation and application of the [Sentencing] Guidelines, and we review the underlying factual findings for clear error." *United States v. Rogers*, 989 F.3d 1255, 1261 (11th Cir. 2021) (quoting *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017)). "A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (citation omitted).

The ultimate determination of market value under § 2Q2.1 is a finding of fact subject to clear error review. *See United States v. Rodebaugh*, 798 F.3d 1281, 1299 (10th Cir. 2015); *United States v. Eyoum*, 84 F.3d 1004, 1008 (7th Cir. 1996); *United States v. Clark*, 986 F.2d 65, 70 (4th Cir. 1993). But the methodology used to determine market value is more appropriately viewed as a matter of law because it involves the application of the language in § 2Q2.1. *Cf. United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013) ("[T]hreshold questions concerning the meaning of 'loss' and

the methodology to be used in measuring that loss present questions of law that call for de novo review."); *United States v. Lige*, 635 F.3d 668, 670–71 (5th Cir. 2011) ("[T]he district court's method of estimating the loss—in this case, looking to the retail prices, rather than the wholesale prices, of the stolen merchandise—is subject to de novo review.").

Before starting our analysis, we provide an overview of the government's valuation calculations for the statues at issue. These valuations were used by the probation officer in the presentence investigation report and adopted by the district court at sentencing.

For statues that had been sold by or purchased by Mr. Martinez, and for limited edition statues where there was a sale of an identical sculpture, the government used the actual sale price—derived from evidence introduced during the trial—as the market value. The figures in the table in the presentence investigation report indicate that the combined market value (based on the actual sale price) of these 12 statues was over $280,000. *See* PSI at ¶ 40. Mr. Martinez did not challenge the evidentiary foundation or the fair market value for these statues in the district court. *See, e.g.,* D.E. 234 at 16 ("If he consummated a transaction and made [a] profit, that's fine. We're not objecting to the profit that was made."). Nor does he do so on appeal.

For the statues that Mr. Martinez offered for sale but had not sold, the government used his listing price (or a midpoint of various listing prices) as the market value. According to the figures in

the table, these 9 statues had a combined market value of $288,000. *See* PSI at ¶ 40.

Mr. Martinez objects to the valuation of these statues, arguing that they *all* should have been given the market value provided by his expert, which was $53,000 based on comparable sales of the same or similar statues. *See* D.E. 213-1 at 11–23 (defense expert's report). His challenge, then, is a global challenge to the district court's methodology. *See* D.E. 234 at 16 ("We're objecting to . . . the government's attempt [to have the court] calculate the amounts that were included in advertisements . . . by Mr. Martinez at a particular amount. Those items never sold, and it would be improper . . . to speculate as to whether or not that amount would have been garnered by Mr. Martinez or not.").

The district court reasoned that Mr. Martinez's listing prices for the 9 unsold statues should be the market value under § 2Q2.1 because Mr. Martinez had been an art dealer for many years, had sold many similar statues with ivory, and had set the sale price. The court explained that Mr. Martinez "set the price on these items that he had" and it "did not see any example where he sold something for less than what he offered it[.]" *Id.* at 17. Mr. Martinez "held himself out to be the expert in this area and he offered [the statues] for sale for these prices," and the court said that was a "factor [it] ha[d] to take into consideration." *Id.* at 18.

**3**

As a theoretical matter, under § 2Q2.1 the market value or fair market retail price of an unsold statue containing ivory could

23-10848                Opinion of the Court                      47

be determined by looking at actual sales of the same statue in the open market in an arm's length transaction around the same period of time or of an identical copy (assuming that the sculpture was part of a limited edition series and that multiple copies of it existed). Such a sale of the same item around the time of the smuggling offense can be a reliable indicator of the statue's market value or fair market retail price. *Cf. Standard Oil of N.J. v. Southern P. Co.*, 268 U.S. 146, 155 (1925) (explaining, in an admiralty case, that "market value" can be "established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market"). This possible methodology, however, does not help Mr. Martinez for two reasons.

First, Mr. Martinez's expert did not always use sales of the *same* 9 statues to determine their market value or fair market retail price. Instead, she sometimes relied on "comparable sales transactions which reflect[ed] the same physical and value characteristics of the subject [statues]." D.E. 213-1 at 4. "Such transactions," the expert explained, "[we]re adjusted based on the degree of similarity with the subject [statue], the date of the transaction, the venue, and the unique physical and value characteristics of the [statue], including condition. Often there are few comparables, particularly with property that is unique, antique, or artist created." *Id.* at 7.

The absence of sales of an identical statue is problematic with respect to setting the market value (or the fair market retail price) here. Some collectors or buyers may be interested in the style, size, and/or period of a sculpture, but others may only want

to buy sculptures by a given artist.  A 42' x 60' rectangular painting of an American flag by an unknown student artist—no matter how imaginative, groundbreaking, or aesthetically pleasing—is not viewed in the same way in the market (and does not have the same cachet or value) as Jasper Johns' celebrated *Flag* (1954), which hangs in the Museum of Modern Art in New York City.  *See* Steinkamp, *Fair Market Value, Blockage, and the Valuation of Art*, 71 Denver U. L. Rev. at 397 ("Art, unlike most property, has no intrinsic value. The value of art largely depends on the reputation of the artist at the time of sale.").

Second, the market in the United States for statues containing ivory is not an open and unrestricted one.  As Mr. Martinez's expert explained in her report, the market is "somewhat volatile, partly due to the uncertainty about laws and restrictions regarding the sale of ivory."  D.E. 213-1 at 5.  And the "appraisal of ivory or items with ivory components has become very problematic due to laws passed in 2016 regarding the ownership, sale, or trading of African ivory."  *Id.*  The fair-market retail price of the unsold statues was therefore "difficult to ascertain," and the district court was allowed to "make a reasonable estimate using any reliable information[.]"  § 2Q2.1, cmt. (n.4).[8]

---

[8] Indeed, even for statues that Mr. Martinez actually sold there were wildly varying figures about its market value.  For example, Mr. Martinez sold one statue (as part of a package deal) for $60,000, but the certificate of authenticity reflected a value of $250,000 and the defense expert put the value at $4,400.

We recognize that the listed sale price of a work of art is not necessarily reflective of its market value or fair market retail price. Buyers of art don't always pay the seller's asking price. *Cf. Bell v. Turner*, 827 F.3d 699, 709 (7th Cir. 2016) (copyright case: "[T]he price that Bell listed on his website is not sufficiently concrete to show the fair market value of his photo."). But the listed price can sometimes be indicative (or at least probative) of market value—take, for example, the starting bid price of a well-known painting or sculpture at an auction house like Sotheby's or Christie's.

In this case we cannot say that the district court's valuation methodology for the 9 unsold statues constituted error under § 2Q2.1. Because of the difficulty in figuring out the market value or fair market retail price, the court was permitted to make a reasonable estimate using any reliable information. The prices set by Mr. Martinez—an experienced art dealer who had been selling statues containing ivory for years—was a reliable indicator of market value; as the court observed, it did not see any examples of a statue not selling at the price Mr. Martinez listed for it, and there is no claim that this factual finding was clearly erroneous. *See United States v. Oehlenschlager*, 76 F.3d 227, 230 (8th Cir. 1996) (applying § 2Q2.1 to the illegal importation of migratory waterfowl eggs: "We agree with the district court's assessment that it is fair and reasonable to base the value of the eggs, for which there is no reasonably available market price, on the value that Oehlenschlager himself placed on the live birds. . . . His price list reveals the market value that he intended eventually to realize from the eggs.").

## VII

We affirm Mr. Martinez's convictions and sentence.

**AFFIRMED.**